**PENSION BENEFIT GUARANTY COR-
PORATION, Plaintiff–Appellant
Cross–Appellee,**

v.

**ALLOYTEK, INC., Defendant–Appellee
Cross–Appellant.**

**Nos. 89–1673, 89–1815.**

United States Court of Appeals,
Sixth Circuit.

Argued June 7, 1990.

Decided Jan. 31, 1991.

Jeanne K. Beck, Stephen Schreiber, Carol Connor Flowe, Alan Siff, James Callear (argued), Washington, D.C., John A. Smietanka, U.S. Atty., Office of U.S. Atty., Grand Rapids, Mich., for plaintiff-appellant cross-appellee.

William E. Rohn, H. Edward Paul, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, Mich., Markham R. Leventhal, Tew, Jorden, Schulte & Beasley, Miami, Fla., Judith R. Cohen (argued), Joseph Robert Rackman, Squadron, Ellenoff, Plesent & Lehrer, New York City, for defendant-appellee cross-appellant.

Before KEITH and NORRIS, Circuit Judges, and POTTER, District Judge *.

---

**4.** We have considered other issues raised by appellant and find that they are without merit.

\* The Honorable John W. Potter, United States District Judge for the Northern District of Ohio, sitting by designation.

JOHN W. POTTER, District Judge.

This is an appeal and cross-appeal from a final judgment of the district court in an action brought under the Employee Retirement Income Security Act of 1974 entered on May 1, 1989. The cause sub judice will be referred to hereinafter as AlloyTek II. A prior action between the parties, filed on May 12, 1981 captioned *AlloyTek, Inc. v. Pension Benefit Guaranty Corporation,* No. G81–249–CA1, will hereinafter be referred to as AlloyTek I. The present controversy and appeal stems from the finding by the district court that AlloyTek I bars relief under AlloyTek II. The district court in AlloyTek II entered summary judgment for the defendant AlloyTek, Inc. (AlloyTek) and against plaintiff Pension Benefit Guaranty Corporation (PBGC) and denied AlloyTek's motion for sanctions.

Appellant asserts the following as its statement of issues:

1. Whether Fed.R.Civ.P. 13(a) bars the PBGC from asserting in the instant action claims that arose solely as a result of the termination of AlloyTek's pension plan or that PBGC acquired standing to assert only after it became trustee of the plan.

2. Whether the doctrine of res judicata bars the PBGC from asserting claims that it acquired standing to assert against AlloyTek only after its plan terminated and the PBGC became statutory trustee.

Appellee and cross-appellant in its counter-statement of issues on appeal asserts that the district judge correctly decided appellant's issues 1 and 2, but asserts the following issues were decided incorrectly by the district court:

3. Whether Counts I and II are barred by applicable statutes of limitations of six years and three years, respectively.

4. Whether the District Court abused its discretion in denying AlloyTek's motion for sanctions with respect to PBGC's assertion of Count III on the basis that PBGC's presentation on this point had been "scholarly" and "professional."

For the reasons hereinafter stated, we reverse the district court as to its grant of summary judgment on issues 1 and 2. We affirm as to appellee and cross-appellant's issue 4 and remand for further proceedings as to issue 3.

The briefs of the parties have been helpful in outlining the history of this controversy. PBGC is a wholly owned United States Government corporation established by 29 U.S.C. § 1302 to administer the pension plan termination insurance program created by Title IV of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1301–1461 (1982). *See Pension Benefit Guar. Corp. v. LTV Corp.,* — U.S. —, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990), re purpose and organization. The plan in controversy was sponsored by Harman International Industries, Inc. for employees at its Granville, Michigan plant. These employees were represented by Local 356 of the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America. In 1977 the defendant and now appellee and cross-appellant purchased the Granville plant from Harman.

In connection with the purchase, AlloyTek and Harman entered into an agreement in which AlloyTek agreed to adopt and continue the plan. The plan was underfunded at the time of the purchase and AlloyTek promised to continue to fund the plan's liabilities. The district judge found that in light of a potential liability under the plan, AlloyTek, as plan administrator, filed a notice of intent to terminate the plan as of October 31, 1979. The notice dated October 19, 1979 also contained the following language:

Finally, AlloyTek intends to adopt and implement two plans. One is called the AlloyTek, Inc. Hourly Rate Employees' Supplemental Retirement Plan and Trust to cover non-P.B.G.C. guaranteed benefits of the terminating [sic] plan. The other, the AlloyTek, Inc. Hourly Rate Employees' Retirement Plan and Trust will provide benefits in respect of future service only from the day after termination of the Plan (November 1, 1979) on.

After a period of negotiation and disclosure of the financial status of the plan, in April, 1981 PBGC informed AlloyTek that it did not consider the plan terminated for the purposes of Title IV of ERISA. PBGC concluded that termination of the plan under such circumstances as proposed would be tantamount to shifting liability for providing retirement benefits from AlloyTek to the PBGC through Title IV guaranties.

The PBGC's refusal to accept the purported plan termination resulted in the initial action between these parties. (AlloyTek I). The district court in its opinion in AlloyTek II outlined the proceedings in AlloyTek I as follows:

> In that case AlloyTek alleged that the PBGC had repudiated its statutory duties under Title IV of ERISA by refusing to assume trusteeship of the Plan or to guarantee payment of uninsured benefits to retirees. In a four-count complaint AlloyTek sought declaratory relief, requesting the Court to find that the PBGC was required by ERISA to accept the Plan termination and assume its statutory duties. In the alternative, AlloyTek alleged that the PBGC had agreed, both verbally and in writing, to accept AlloyTek's Plan termination. Thus AlloyTek alleged it was entitled to specific performance of ths [sic] "agreement" or a judicial determination that PBGC was estopped to refuse to terminate the Plan and assume its trusteeship. AlloyTek also moved for a preliminary injunction to effect implementation of the Plan termination.
>
> On May 22, 1981, this Court entered an order agreed upon by the parties requiring both parties to G81–249 to pay the Plan trustee "an amount equal to one-half of the benefits becoming due under the Plan commencing June 1, 1981 and continuing for a period of 120 days thereafter." AlloyTek's Appendix at 56. On June 1, 1981 PBGC filed its answer to the complaint in G81–249 containing a counterclaim for the sum of the court-ordered payments. In that pleading the PBGC alleged that the Plan had not terminated and that the PBGC's payments were the responsibility of AlloyTek. *Id.*

at 62–64. It sought recovery of PBGC's court-ordered payments along with interest, costs of litigation, and other "just and proper" relief.

Before that 1981 action went to trial, the parties entered into a settlement agreement which was the basis for a consent order dismissing that case on November 3, 1981. The settlement agreement and consent order are attached hereto as Appendix A. The settlement provided in pertinent part that: the date of plan termination is October 31, 1979; the PBGC is appointed Trustee of the Plan pursuant to Section 4042(b) and (c) of the Act, 29 U.S.C. § 1342(b) and (c); the PBGC will have all the rights, powers, and duties of a trustee specified by the Act or otherwise granted by law with respect to the Plan. The settlement agreement also provided that upon PBGC's execution of the trusteeship agreement, "the pending litigation shall be terminated by the entry of a consent order dismissing with prejudice all claims and counterclaims of the parties." AlloyTek's appendix at 192. Such a consent order was indeed entered and a Trusteeship Agreement was executed. These were jointly submitted by the parties.

On August 8, 1985 PBGC informed AlloyTek that PBGC had determined that $972,120.00 was owed as unpaid contributions to the Plan, and that PBGC was authorized to collect this amount as trustee of the Plan. Also, in a letter to Hilary B. Miller, Chairman of AlloyTek, Inc., dated October 29, 1985 the PBGC stated that it had determined that the value of the guaranteed plan benefits was $5,126,817.00 and that the value of the plan assets was $1,017,302.00. Thus, the Plan asset insufficiency was $4,109,515.00. The PBGC also indicated in the letter that it had determined that the company's net worth on the date of the Plan termination was $3,600,000.00 and that 30% of the company's net worth did not exceed the Plan asset insufficiency, thus the company's employer liability under § 4062 was $1,080,000.00. *See* 29

U.S.C. § 1362(b).[1]  On October 31, 1985, after AlloyTek refused to pay the sums indicated above, PBGC initiated the instant action (AlloyTek II).

In its first amended complaint PBGC demanded judgment in its favor against AlloyTek under Count I for its statutory liability under 29 U.S.C. § 1362 in the minimum amount of $1,080,000.00 plus interest. Under Count II, as statutory trustee of the Plan, PBGC alleged that AlloyTek had failed to make all the contributions it was obligated to make to the Plan under ERISA and the terms of the Plan.  PBGC asserted that to date the contributions AlloyTek owed the Plan including interest totaled over $972,120.00.  In Count III PBGC asserted an additional claim as statutory trustee to enforce the third-party beneficiary rights of participants under the Harman agreement, or in the alternative, as statutory guarantor of the pension benefits accrued by participants under the terms of the Plan, that PBGC was subrogated to the rights of the participants against AlloyTek under the Harman agreement in regard to the funding of such benefits.  PBGC also prayed for judgment for costs of litigation including reasonable attorney's fees and expenses and such further legal and equitable relief as the court deemed just and proper.

AlloyTek filed a motion to dismiss and an alternative motion for summary judgment. Subsequently, AlloyTek also filed a motion to strike plaintiff's first amended complaint, an alternative motion to dismiss the complaint with prejudice and a motion for sanctions.  Defendant AlloyTek asserted in its motions to dismiss and for summary judgment that plaintiff's claims constituted compulsory counterclaims in the previous lawsuit, see Fed.R.Civ.P. 13(a)[2], that if the compulsory counterclaim rule did not mandate dismissal of Counts II and III the doctrine of res judicata required this result, that sanctions should be applied against PBGC's counsel for filing the first amended complaint and that Counts I and II were barred by the applicable statute of limitations.

After briefing and oral argument, the court issued, in pertinent part, the following order:

> IT IS HEREBY ORDERED that the motion of defendant AlloyTek for summary judgment is granted and the complaint is dismissed.  The Court finds there are no genuine issues of material fact such that the complaint should not be subject to dismissal under Rule 13(a), Fed.R.Civ.P. Counts I, II and III are compulsory counterclaims which should have been asserted in *AlloyTek I.* Further, Counts II and III are barred by the doctrine of res judicata.  Defendant's motion for sanctions is denied, and defendant's motion to strike amended complaint is declared moot.

The court did not rule on whether or not Counts I and II were barred by statutes of limitations.

As is evident from the district court's opinion it dismissed Counts I, II and III on the grounds that Fed.R.Civ.P. 13(a) required that PBGC assert these claims as counterclaims in AlloyTek I.  Additionally, the district court found that Counts II and III were barred by the doctrine of res

---

1.  Any employer to which this section applies shall be liable to the corporation, in an amount equal to the lesser of—
    (1) the excess of—
    (A) the current value of the plan's benefits guaranteed under this subchapter on the date of termination over
    (B) the current value of the plan's assets allocable to such benefits on the date of termination, or
    (2) 30 percent of the net worth of the employer determined as of a day, chosen by the corporation but not more than 120 days prior to the date of termination, computed without regard to any liability under this section.

Statutory references are to the law as it existed prior to 1986 amendments.

2.

(a) Compulsory Counterclaims.  A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

judicata. The court found that in its counterclaim in AlloyTek I PBGC sought reimbursement for contributions AlloyTek failed to make to the Plan under 29 U.S.C. § 1342(d)(1)(B)(ii), and therefore, the doctrine of res judicata was applicable as a bar to these claims. The finding was based on the fact that the court found that PBGC's counterclaim for the return of court ordered payments for participant benefits, which amounts PBGC alleged to be AlloyTek's obligations, resulted in barring the subsequent claims for plan contributions, Count II, and third party beneficiary contract claims, Count III. The court refused to recognize a dual role for PBGC as administrator in AlloyTek I and that of trustee in the action filed by PBGC, AlloyTek II.

Because we believe that the district court has misinterpreted the intent of 29 U.S.C. §§ 1301–1461 (1982), we reverse. Since we are reviewing a summary judgment, the scope of review is de novo. *McKee v. Cutter Laboratories, Inc.*, 866 F.2d 219, 220 (6th Cir.1989).

Basically, the reasons against the application of Rule 13(a) and the doctrine of res judicata are the same, and that is that to require the assertion by PBGC of the claims it now asserts in AlloyTek II to be required claims in AlloyTek I upsets the statutory scheme in ERISA which governs the termination of plans and the financing of the Title IV insurance program.

Some of the confusion here comes about because AlloyTek seized the initiative in AlloyTek I, as outlined above in the statement of facts, and asked that the Plan be terminated. The statutory scheme envisions that once the PBGC determines that an insufficient plan should be terminated and so notifies the plan administrator, PBGC then seeks the appointment of a trustee, termination of the Plan, and a date of termination by court action or by agreement. *See* 29 U.S.C. §§ 1341, 1342(a), (b), (c) and § 1348. *In re Pension Plan for Employees of Broadway Maintenance,* 707 F.2d 647 (2d Cir.1983); 60 Am.Jur.2d *Pensions and Retirement Funds* § 881.

Under 29 U.S.C. § 1341(a), a plan administrator may initiate proceedings by filing notice with the corporation. If the corporation determines that certain facts exist, it may then proceed under 29 U.S.C. § 1342(c) to terminate a plan. *See Pension Benefit Guar. Corp. v. Heppenstall Co.*, 633 F.2d 293 (3d Cir.1980). Section 1341 of 29 U.S.C. delineates the procedure for a voluntary termination. Section 1342 of 29 U.S.C. delineates the procedure for an involuntary termination. Under this section the corporation may apply to a United States district court to terminate the plan. See 29 U.S.C. § 1342(a). Under § 1342(b) the corporation may, upon notice to the plan, apply to the appropriate United States district court for appointment of a trustee to administer the plan pending the issuance of a § 1342(c) decree adjudicating that the plan must be terminated. The plan administrator may petition for the appointment of a trustee (§ 1342(b)(2)(A)), and the corporation and the plan administrator may agree to the appointment of a trustee (§ 1342(b)(3)). In AlloyTek I it appears that AlloyTek endeavored to utilize the procedures of both Sections 1341 and 1342. AlloyTek initiated the proceeding for voluntary termination. When this procedure was not successful, it then filed AlloyTek I praying for a declaratory judgment and injunctive relief in order to require PBGC to terminate the Plan and to appoint a trustee. However tortuous was the route to the termination of the Plan and to the appointment of the trustee, the parties agreed to a consent order which incorporated their agreement and terminated the Plan, established a termination date and provided for the appointment of a trustee. Section 1342(c) of 29 U.S.C. provides that:

If the corporation and the plan administrator agree that a plan should be terminated and agree to the appointment of a trustee without proceeding in accordance with the requirements of this subsection (other than this sentence) the trustee shall have the power described in subsection (d)(1) of this section and, in addition to any other duties imposed on the trustee under law or by agreement between the corporation and the plan administrator, the trustee is subject to the duties

described in subsection (d)(3) of this section.

Upon appointment, the trustee was armed with the powers granted in 29 U.S.C. § 1342(d)(1)(B) which provides that the trustee shall have the power:

(ii) to collect for the plan any amounts due the plan;

.        .        .        .        .

(iv) to commence, prosecute, or defend on behalf of the plan any suit or proceeding involving the plan;

.        .        .        .        .

(viii) to do such other acts as may be necessary to comply with this subchapter or any order of the court and to protect the interest of plan participants and beneficiaries.

■ While appellee generally agrees with the assertion that a trustee, after appointment, should go forward to collect funds due the plan, it argues that AlloyTek I is sui generis. That its case is unique, appellee argues, stems from the extent of discovery and negotiation between the corporation and the plan administrator prior to the filing of AlloyTek I and that during that action the filing of the counterclaim by the corporation and the subsequent consent entry which dismissed all claims with prejudice bar further proceedings under Alloy-Tek II. PBGC suggests that to conclude that under the facts of this case it had to assert in AlloyTek I all of its claims would be a disastrous precedent for the orderly and statutorily conceived administration of the law. We agree.

If the Court were to follow appellee's suggestion whether or not an action was brought by PBGC or by a plan administrator, a district court in each termination case would have to decide if there had been sufficient negotiations or discovery to cause PBGC to assert all of the claims it may have against a plan administrator. Each case would become sui generis for the ingenious advocate.

Appellant asserts and we agree that Title IV contemplates that there are two separate and distinct phases with respect to insufficient plans. First, the plan will be terminated and a trustee appointed; and, second, the trustee will proceed under 29 U.S.C. § 1342 to secure the funds owed the plan. We find that our earlier case of *Pension Benefit Guar. Corp. v. Roth*, 667 F.2d 1027 (6th Cir.1981), 2 Employee Benefits Cas. (BNA) 1977 (1981), persuasive on this material issue.[3] While that case turned on the issue of coverage under Title IV of ERISA, the court made the following pertinent observation:

· [2] It appears that Kuhlman's real concern centers on its fear that in any future litigation seeking to hold Kuhlman liable to PBGC to reimburse it for payments made by PBGC to the participants of the terminated Kuhlman Plan, that liability, in the light of the district court's instant decision, will be held to be res judicata. The position of PBGC and UAW is that even though Kuhlman's liability will turn on the same facts as those that are determinative in the present litigation and even though the issues adjudicated in this litigation will be a subject of collateral estoppel, Kuhlman's liability for such contributions would not be determined by application of res judicata. PBGC and UAW contend that this is true because Congress has authorized the PBGC to "split its cause of action" in litigation involving termination of pension plans, and therefore the instant litigation and the succeeding litigation would not be the "same cause of action." We agree that Kuhlman's liability under 29 U.S.C. § 1362(b) to reimburse PBGC for payments to the participants of the terminated Kuhlman Plan would not be a matter of res judicata based on the adjudication made in the instant litigation.

In addition to the analysis presented above, the statutory scheme relative to authorizing PBGC to bring an action to recover employer's liability for a period of six years after the plan termination, 29 U.S.C.

---

**3.** We recognize that the citation of unpublished per curiam opinions is disfavored. We cite *Roth*, however, because it establishes the law

governing the present action and "there in no [Sixth Circuit] published opinion that could serve as well." *See* 6th Cir.R. 24(c).

§ 1368(d)(2), supports the holding that two actions are contemplated. Section 1362 of 29 U.S.C. refers to an employer's liability where there are insufficient assets to pay guaranteed benefits as of the plan termination date. *See* 60A Am.Jur. *Pension and Retirement Funds* § 976. The liability of the employer under 29 U.S.C. § 1362 springs from rather than ceases upon plan termination. In an appropriate case there are administrative procedures to be exhausted. *See also* 29 U.S.C. § 1342(d)(1)(B) relative to the powers of the trustee previously referred to. To require PBGC in an action to terminate the plan and for the appointment of a trustee to assert claims for funds due because of insufficient funding or contribution would nullify all of the foregoing procedures and remedies.

The parties in AlloyTek I apparently recognized this fact because the agreement for appointment of trustee and termination of plan specifically stated that "(3) The PBGC will have with respect to the Plan, all of the rights, powers and duties of a trustee specified in the Act or otherwise granted by law."

The specific statutory provision of ERISA prevails over Rule 13(a) which is a general rule of procedure. *See* generally, *Bigger v. American Commercial Lines*, 862 F.2d 1341, 1344 (8th Cir.1988), where the court observed that "[T]his rule [of statutory construction] applies with special force with regard to a reticulated statute such as ERISA." *Cf. Robbins v. Pepsi–Cola Metropolitan Bottling Co.*, 800 F.2d 641 (7th Cir.1986); *Caleshu v. United States*, 570 F.2d 711 (8th Cir.1978). See generally *Pension Benefit Guar. Corp. v. LTV Corp.*, —— U.S. ——, 110 S.Ct. 2668, 2675, 110 L.Ed.2d 579 (1990). Under 29 U.S.C. § 1362, PBGC is authorized to pursue funds due the corporation after the date of termination of the plan. 29 U.S.C. § 1342 authorizes the trustee to collect for the plan any amounts due the plan. We therefore find that Rule 13(a) does not bar PBGC from now asserting claims which arose solely as a result of the termination of AlloyTek's pension plan. Appellant's issue I is well taken.

■ For the reasons stated above and for the following reasons, we find that the doctrine of res judicata does not bar PBGC's claims asserted in Counts II and III of its complaint. *White v. Colgan Elec. Co.*, 781 F.2d 1214, 1216 (6th Cir.1986), stands for the proposition that res judicata is a bar to "every matter which is actually offered, but also to every ground of recovery which might have been presented." However, this doctrine is not applicable here.

We again refer to the holding in *Roth.* Further, we find that the claims set forth in AlloyTek II are distinct from PBGC's counterclaim in AlloyTek I. In AlloyTek I, PBGC counterclaimed for one-half of the benefits which came due under the Plan for a 120 day period commencing June 1, 1981. These benefit payments were paid to J. Henry Schroeder Bank & Trust Company, trustee of the AlloyTek Hourly Rate Employees Pension Plan. In AlloyTek II the contributions claimed are those contributions AlloyTek was required to make under ERISA before October 31, 1979 and funds due under the Harman agreement.

PBGC does not contest that it cannot now collect the court-ordered payment of benefits. In any event, the retroactive termination date has shifted to PBGC the responsibility to pay those benefits. Counts II and III are for contributions due the Plan. AlloyTek's argument that the AlloyTek I agreement reduced its potential for contributions and, therefore, it is relieved from any obligation to pay the larger sum is not well taken. The claims are distinct; the Plan had not been terminated; and a statutory trustee had not been appointed.

While AlloyTek alleges that this cause is generic, and it would be essentially inequitable to require it to pay the sums prayed for under Counts I, II and III, it must be remembered that the purpose of the statute is not to bail out the employer, but to protect the plan participants. *See In re Syntex Fabrics, Inc. Pension Plan*, 698 F.2d 199 (3d Cir.1983).

Appellant has advanced other reasons why Rule 13 and the doctrine of res judica-

ta are not applicable. Because we have decided that the statutory scheme does not require the application of either the Rule or the doctrine, we have not commented on appellant's other arguments for reversal. The district court is REVERSED as to issues 1 and 2 and as to these issues the cause is REMANDED.

Because we have found appellant's issues 1 and 2 to be well taken, we find issue 4 of appellee and cross-appellant not well taken. The district court is as to issue 4 AFFIRMED.

The district court did not rule on whether or not Counts I and II are barred by the applicable statutes of limitations. This cause is affirmed in part and reversed in part and is remanded for consideration of the applicability of the statutes of limitations and for further proceedings consistent with this opinion.